Ciparick, J.
(dissenting). I respectfully dissent. If our complex, collaborative system of education is to work, and if local control and autonomy at the school district and Board of Education level is to have real meaning, the Legislature and other governmental officials responsible for maintaining the educational system cannot be immunized from accountability in a suit of this nature. The Legislature has delegated virtually all of the day-to-day responsibilities involving the provision of education and the management of educational affairs to local authorities. When these local entities are unable to fulfill their constitutional and statutory obligations because of the State’s failure to carry out its own constitutional obligations, a substantive right to sue has been and must continue to be recognized (see, Matter of Jeter v Ellenville Cent. School Disk, 41 NY2d 283, 287; Board of Educ. v Allen, 20 NY2d 109, 118; Board of Educ., Levittown Union Free School Dist. v Nyquist, 83 AD2d 217, 234, mod 57 NY2d 27). Accordingly, we would hold that the New York City Board of Education and the Chancellor of the City School District (school plaintiffs) have the capacity to bring this action. We also would hold that New York City and its Mayor (city plaintiffs) have capacity to bring this suit for reasons we discuss below.
This is a declaratory judgment action challenging the constitutionality and legality of New York State’s current statutory methodology for financing public education. Supreme Court dismissed plaintiffs’ complaint in its entirety for lack of capacity to sue. The Appellate Division agreed, reasoning that "units of municipal government, as political subdivisions created by the State, lack the capacity (with very limited exceptions not applicable here) to challenge in a lawsuit the constitutionality of State legislative enactments affecting them (Town of Black Brook v State of New York, 41 NY2d 486, 488; Matter of Jeter v Ellenville Cent. School Disk, 41 NY2d 283, 287)” (205 AD2d 272, 277-278).
I.
Although courts often use the terms interchangeably, the concepts of capacity to sue and standing are distinct (see, *297 Community Bd. 7 v Schaffer, 84 NY2d 148, 155). Capacity to sue "concerns a litigant’s power to appear and bring its grievance before the court” (id., at 155). Standing is "designed to ensure that the party seeking relief has a sufficiently cognizable stake in the outcome” so as to cast the controversy " ' "in a form traditionally capable of judicial resolution” ’ ” (id., at 154-155 [quoting Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772]). "Capacity, or the lack thereof, sometimes depends purely upon a litigant’s status” (Community Bd. 7, supra, at 155). For instance, an infant or an individual adjudicated incompetent may be disqualified from seeking relief in court (id.).
The question of capacity to sue often arises when governmental entities, which are creatures of statute, attempt to sue. In that context, the right to sue, "if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate” (id., at 156 [citing Matter of Pooler v Public Serv. Commn., 58 AD2d 940, affd on mem below 43 NY2d 750; Matter of Flacke v Freshwater Wetlands Appeals Bd., 53 NY2d 537]).
We first address the capacity of the school plaintiffs. Plaintiff Board of Education’s authority to sue is well recognized in case law. This Court has observed that the Board of Education of the City of New York is not a mere department of government, but "an independent corporate body” which "may sue and be sued in its corporate name” (Matter of Divisich v Marshall, 281 NY 170, 173) "in all matters relating to the control and management of the schools” (Gunnison v Board of Educ., 176 NY 11, 17; see also, Matter of Fleischmann v Graves, 235 NY 84). As to whether the City Board of Education can sue the State in matters relating to the control and management of the schools, we conclude that the answer is yes based on our examination of relevant authority.
In Board of Educ. v Allen (20 NY2d 109), several local Boards of Education challenged the constitutionality of a State statute permitting school authorities to loan textbooks free of charge to children enrolled in parochial schools. This Court stated: "The cases holding that a public body has no standing to challenge a State statute restricting its governmental powers are not in point (e.g., City of Buffalo v. State Bd. of Equalization, 26 A D 2d 213; County of Albany v. Hooker, 204 N. Y. 1, 9-10; Black Riv. Regulating Dist. v. Adirondack League Club, 307 N. Y. 475, 487; St. Clair v. *298 Yonkers Raceway, 13 N Y 2d 72, 76, cert. den. 375 U. S. 970)” (id., at 118). The reason for our conclusion, we stated, was adequately set forth in the opinion by Special Term:
"Granted there is apparent substantial authority prohibiting a municipality or agency of the State from challenging a State statute (Black Riv. Regulating Dist. v. Adirondack League Club, 307 N. Y. 475), but the rule could be subject to some conditions and limitations, which appear particularly appropriate in the pending matter. A school district and its Board of Education is more than a mere agent of the State. It is an entity performing a State purpose pursuant to the mandate of the People as directed by their Constitution. (N. Y. Const., art. XI, § 1; Education Law, § 2, subd. 14; Matter of Divisich v. Marshall, 281 N. Y. 170.)” (Board of Educ. v Allen, 51 Misc 2d 297, 299 [emphasis added].)
We further noted in Allen that the plaintiffs were not seeking to augment their powers, but were "asking for a court determination (in the form of a declaratory judgment) concerning whether they are legally authorized to spend public money for purposes purporting to be authorized by [the] statute”, and that "[t]he right of a local Board of Education to sue the State Commissioner of Education has frequently been upheld including actions involving the question of constitutionality of State statutes. (Matter of Board of Educ. of Cent. School Dist. No. 2 v. Allen, 14 A D 2d 429; Matter of Bethlehem Union Free School Dist. v. Wilson, 303 N. Y. 107; Matter of Board of Educ. of Union Free School Dist. No. 3 v. Allen, 6 A D 2d 316, affd. 6 N Y 2d 871.)” (20 NY2d, at 118.)
Here, as in Allen, school plaintiffs are not attempting to augment their powers, but instead seek a determination in the form of a declaratory judgment that the State is not in compliance with its constitutional obligations. School plaintiffs complain that the statutory scheme for funding public education fails to provide them with sufficient resources to enable them to discharge their obligations under the Education Article of the State Constitution. This case thus falls squarely within a well-defined exception to the general rule of lack of capacity to sue which arises where "municipal challengers assert that if they are obliged to comply with the State statute they will by that very compliance be forced to violate a *299 constitutional proscription” (see, Matter of Jeter v Ellenville Cent. School Dist., 41 NY2d 283, 287; Allen, supra).
A more recent recognition of the right of local school authorities to sue the State occurred in Levittown (83 AD2d 217, 234, mod 57 NY2d 27, supra). The plaintiffs there were the City of New York and the Boards of Education of various property-poor school districts, including New York City, Buffalo, Rochester, and Syracuse. The State defendants challenged the plaintiffs’ capacity to sue in the lower courts. The Appellate Division ruled in favor of the plaintiffs, stating:
"Two of defendants’ threshold contentions — both fastening upon aspects of justiciability * * * —merit summary dispatch. The various boards of education have standing to make the current challenge (see Board of Educ. v Allen, 20 NY2d 109, affd 392 US 236), and, in view of the 'expanding scope of standing’ * * * the school children represented by their parents have similar status” (Levittown, 83 AD2d 217, 233-234 [citations omitted]).
Although the Levittown Appellate Division used the term standing, as courts often do, the Court was clearly addressing the capacity issue as evidenced by its citation to Allen.
On appeal, this Court reached the merits, stating that it was our responsibility "to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions which constrain the activities of all three branches” (57 NY2d, at 39). Although the Levittown defendants did not argue lack of capacity before this Court, there is no question in my mind that the Appellate Division’s decision, which stands for the proposition that the State can be sued in a declaratory judgment action challenging the constitutionality of the public school funding scheme, was correct and should be followed here.
In our view, the majority’s extremely limited application of the general rule of lack of capacity is inappropriate here because it undermines the power and autonomy of local Boards of Education. Public education in New York is a complex, collaborative enterprise between a decentralized State authority and autonomous local districts endowed with broad powers and responsibilities for the management and control of day-to-day educational affairs:
"Our State Constitution mandates that the 'legislature shall provide for the maintenance and sup *300 port of a system of free common schools, wherein all the children of this state may be educated’ (N. Y. Const., art. XI, § 1; emphasis supplied). The Legislature has imposed this duty in cities upon local boards of education (Education Law, § 2554).” (Matter of Wiltwyck School for Boys v Hill, 11 NY2d 182, 191 [emphasis added]; see also, Herman v Board of Educ., 234 NY 196, 202 ["The board of education is the agency to which the state delegates the power and duty of controlling the schools in the district”].)
The right to sue logically and necessarily derives from this statutory state of affairs. Indeed, how are local school districts to discharge their many duties if they are powerless to hold the State responsible where, as here, it is claimed that the State is failing to carry out its own constitutional mandate with respect to funding public education? For our system of education to work, there must be accountability.
Contrary to the majority’s view, local school districts and Boards of Education are not mere "artificial creatures of statute” (majority opn, at 292); rather, they are substantially autonomous entities entrusted with carrying out a State purpose, and they possess broad powers and duties delegated to them by the State through Education Law § 2554. The City Board of Education is charged with the general administration and control of all aspects of educational affairs. Among other powers, duties, and responsibilities, it is empowered to create, abolish, and maintain positions, divisions, boards, bureaus, etc. (Education Law § 2554 [2]); appoint superintendents, examiners, directors, principals, teachers, nurses, etc. (id.); take care, custody, control and safekeeping of all school property and dispose of and sell all property (Education Law § 2554 [4], [5]); lease property for school accommodations (Education Law § 2554 [6]); purchase and furnish equipment, books, textbooks, furniture, and other supplies as may be necessary for the use of children (Education Law § 2554 [7]); establish, maintain and equip libraries and playgrounds (Education Law § 2554 [10]); and, authorize the general courses of study in schools and approve the content of such courses (Education Law § 2554 [11]). The powers and duties delegated to plaintiff Board of Education have also been delegated to plaintiff Chancellor through Education Law § 2590-h (17).
The majority’s reliance on several older United States Su *301 preme Court decisions which merely state the general rule that municipal corporations are but agents of the State have little persuasive value in the specific context of this modern-day challenge to the constitutionality of the State’s public school financing scheme (see, majority opn, at 290).[1] The cases cited by the majority fail to reflect the Supreme Court’s more recently expressed view that local school districts are not mere arms of the State, but actually possess a significant degree of independence and autonomy which must be recognized and respected.
In Milliken v Bradley (418 US 717), the Supreme Court rejected interdistrict busing as a remedy for unconstitutional segregation in the Detroit, Michigan, public school system. The District Court in Milliken, as does the majority here, took a narrow view of local school districts as mere political subdivisions established for administrative convenience (see, id., at 741). The Supreme Court soundly rejected this analytical approach as "contrary to the history of public education in our country” (id., at 741). The Supreme Court noted that in Michigan, as in this State, school districts are formally considered "instrumentalities of the State and subordinate to its State Board of Education and its legislature” (id., at 726, n 5). Nonetheless, while Michigan school districts were instrumentalities of the State in theory, in practice the Michigan educational structure actually endowed them with "a large measure of local control” (id., at 742) over day-to-day educational affairs, as evidenced by their statutory powers to acquire real and personal property, hire and contract with personnel, borrow money, determine the length of school terms, determine courses of study, make rules and regulations for operating schools, and so on (id., at 742, n 20). Thus, although school districts are, in theory, creatures of the State, the State’s theoretical supremacy must sometimes give way to the realities of local control and autonomy, most especially in the area of education:
"No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community *302 concern and support for public schools and to [the] quality of the educational process. See Wright v. Council of the City of Emporia, 407 U. S., at 469. Thus, in San Antonio School District v. Rodriguez, 411 U. S. 1, 50 (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.’ ” (Id., at 741-742.)
In Washington v Seattle School Dist. No. 1 (458 US 457), the Supreme Court permitted a local school district to assert the Fourteenth Amendment to invalidate a State initiative aimed at banning the use of mandatory busing as a means of promoting integration in Washington’s public schools. The Court acknowledged the State’s formal authority over local school districts, but found it highly significant that "Washington has chosen to meet its educational responsibilities primarily through 'state and local officials, boards, and committees,’ * * * and the responsibility to devise and tailor educational programs to suit local needs has emphatically been vested in the local school boards” (id., at 477-478 [citations omitted]; see also, Lawrence County v Lead-Deadwood School Dist., 469 US 256 [Supreme Court permitted a South Dakota county to assert the Supremacy Clause to preempt State law limiting discretion to use Federal funds]).
The Supreme Court of Kentucky has addressed the precise issue before us today, holding that local school districts have capacity to sue the legislature in the context of a constitutional challenge to the public school financing scheme (see, Rose v Council for Better Educ., 790 SW2d 186, 201, n 16). Notably, the court rejected the same "sterile logic” the majority resurrects today — that local Boards of Education are creatures of the State who cannot sue the State (id., at 200). We agree with the Kentucky court’s reasoning that such a rule would be illogical in light of the many broad and specific powers conferred upon school districts by the legislature and the absence of any statutory restriction on the right of local boards to sue (id.). The Kentucky court stated, in words that could not be more fitting here:
"The subject matter of this lawsuit is whether the General Assembly has complied with its constitu *303 tional duty to provide an 'efficient’ system of common schools in Kentucky. Who is better qualified, who is more knowledgeable, who is more duty-bound, than the local school boards to raise the question? If the General Assembly is not adequately meeting its responsibility, how can the local boards meet theirs?” (Id., at 200.)
As the Kentucky Supreme Court stated, "a lawsuit to declare an education system unconstitutional falls within the authority, if not the duty, of local school boards to fulfill their statutory responsibilities, no matter who the defendants are” (id., at 201).
The majority’s extensive quotation of Black Riv. (307 NY 475, supra) reflects a regression into formalism and rigidity (majority opn, at 291). As the majority notes, we held in that case that the plaintiff river regulating district " 'has no special character different from that of the State.’ ” (Id., at 291 [quoting Black Riv., supra, at 489].) Just the opposite is true here. Local school districts and their Boards of Education have a "special character” and place in our State; they cannot be equated with the purely governmental subdivisions at issue in the cases the majority relies upon. As we stated in Levittown:
" 'For all of the nearly two centuries that New York has had public schools, it has utilized a statutory system whereby citizens at the local level, acting as part of school district units containing people with a community of interest and a tradition of acting together to govern themselves, have made the basic decisions on funding and operating their own schools. Through the years, the people of this State have remained true to the concept that the maximum support of the public schools and the most informed, intelligent and responsive decision-making as to the financing and operation of those schools is generated by giving citizens direct and meaningful control over the schools that their children attend’ ” (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 46, supra).
In our view, the majority’s refusal to infer capacity to sue on the part of the school plaintiffs rests on a foundational premise — the State’s legal supremacy — that simply cannot be reconciled with reality and actual practice. Local school districts *304 and Boards of Education possess substantial independence and control, the significance of which must be recognized and respected rather than ignored.
II.
A governmental entity’s capacity to bring suit may be inferred as a necessary incident of its powers and responsibilities, provided that no clear legislative intent negates review (see, Matter of City of New York v City Civ. Serv. Commn., 60 NY2d 436, 444-445). We have stated that the authority to bring a particular claim may be inferred when the agency in question has "functional responsibility within the zone of interest to be protected” (id., at 445). In Community Bd. 7 (supra), we concluded that the petitioner community board had such functional responsibility. The petitioner was challenging a City agency’s decision denying it "access to certain documents which, arguably, might be useful in carrying out its statutorily mandated responsibility to study the land use proposal and to make appropriate recommendations to the Borough President and Planning Department” (84 NY2d, at 157 [emphasis added]).[2] The inquiry did not end there, however, and we ultimately concluded that even though petitioner had functional responsibilities within the "zone of interest”, other factors negated the inference of capacity, including the actual "terms and history of [petitioner’s] own enabling legislation” and its "limited role in the land use planning process” (id., at 157).
Nonetheless, applying this inferred authority standard here, it is clear that the school plaintiffs’ authority to sue defendants must be inferred as a necessary incident of their broad powers and responsibilities in all matters relating to the control and management of the schools and in light of the State’s decentralized role in our educational structure. School plaintiffs satisfy the "zone of interest” test, as they possess the requisite "policy-making authority and functional responsibility” from which the capacity to sue may be inferred (see, City of New York, 60 NY2d, at 442; Community Bd. 7, supra; cf., Matter of Bradford Cent. School Dist. v Ambach, 56 NY2d 158, 163-164). Moreover, neither the majority nor defendants *305 point to anything negating the inference of capacity on the part of the school plaintiffs in this case. To the contrary, the comprehensive nature of the school plaintiffs’ powers and duties unequivocally supports a finding of capacity to sue here.
In conclusion, the City Board of Education is responsible for providing a constitutionally adequate education to the students in its charge. If, as alleged in this case, the current statutory public school financing scheme is so flawed that it effectively prevents the Board from carrying out its responsibilities within its "zone of interest”, then the right to seek a declaratory judgment aimed at correcting those flaws must be inferred (see, Community Bd. 7, supra; City of New York, supra; Board of Educ. v Allen, supra; Board of Educ., Levittown Union Free School Dist. v Nyquist, 83 AD2d 217, supra; Rose v Council for Better Educ., supra).
Accordingly, we would hold that the school plaintiffs have capacity to bring this declaratory judgment action challenging the constitutionality of the public school financing system.
III.
Finally, we address the city plaintiffs’ capacity to sue. The New York City Charter expressly authorizes the City to sue and be sued, and states in pertinent part:
"Except as otherwise provided in this chapter or other law, the corporation counsel shall have the right to institute actions in law or equity and any proceedings provided by law in any court, local, state or national, to maintain, defend and establish the rights, interests, revenues, property, privileges, franchises or demands of the city or of any part or portion thereof, or of the people thereof’ (NY City Charter § 394 [c]).
Thus, New York City, through its Corporation Counsel, may bring suit to protect and vindicate the rights, property, and revenues of the City and its citizens.
The city plaintiffs are responsible for the maintenance and support of public schools in the City School District and have distinct functional responsibilities within the zone of interest to be protected. The City is under a statutory obligation to provide substantial financial support for its school children (see, Education Law § 2576), and if the educational financing *306 system is constitutionally infirm, as is alleged here, the City is obviously affected, as it is saddled with, among other things, an increased financial burden. Moreover, the New York City Charter imposes significant responsibilities on the City with respect to education (see, NY City Charter §§ 520-523). The city plaintiffs’ capacity to bring this suit in order to protect the rights, property and revenue of the City must be inferred from these responsibilities and from its financial obligations (see, Community Bd. 7, supra; City of New York, supra).
Accordingly, we would reverse the order of the Appellate Division and reinstate plaintiffs’ complaint in its entirety.
Judges Simons, Titone and Bellacosa concur with Judge Levine; Judge Ciparick dissents in a separate opinion in which Judge Smith concurs; Chief Judge Kaye taking no part.
Order affirmed, with costs.

. We consider the majority’s heavy reliance on County of Albany v Hooker (204 NY 1) even less persuasive. That case was decided in 1912, well before Allen and other cases which developed the exceptions to the general rule of lack of capacity to sue were decided, and did not even involve educational issues or school entities as plaintiffs.

. In Community Bd. 7 we noted that the "zone of interest” test, as used in the capacity context, "is related but not identical to the 'zone of interest’ analysis that is traditionally applied in the allied area of standing” (84 NY2d, at 156).